# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>Daemion TAYLOR<br><br><br>*Defendant(s)* | )<br>)<br>) Case No. **17-M-1369**<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __9/2017-11/9/2017__ in the county of __Milwaukee__ in the __Eastern__ District of __Wisconsin__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), and 846 | conspiracy to distribute cocaine and the possession with intent to distribute |

This criminal complaint is based on these facts:
See Affidavit attached.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jeff Milam, Special Agent DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/13/17

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR CRIMINAL COMPLAINT

I, Jeff Milam, being first duly sworn, hereby depose and state as follows:

## I.  BACKGROUND AND EXPERIENCE

1.  I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since approximately September 2014. Prior to my current assignment, I was employed as a police officer with the St. Louis County Police Department in St. Louis, Missouri. During the last three years of my previous employment, I was a Task Force Officer with the DEA. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.  During my tenure as a DEA agent, I have been involved primarily in the investigation of narcotics traffickers operating in the State of Wisconsin and throughout the United States. I have received training in the investigation of drug trafficking; I have worked with informants in the investigation of drug trafficking; and I have participated in the application of and execution of numerous search warrants, narcotics investigations, and arrests in which controlled substances and drug paraphernalia were seized. Based on my training, experience and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

   a.  I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States.

   b.  I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances.

c.  I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

d.  I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business.

e.  I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control.

f.  I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have immediate access to them.

g.  It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

h.  It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

i.  Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment.

2

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities.

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency.

l. I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

m. I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization(s).

n. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices.

o. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular /

3

wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

3. I am currently participating in an investigation of cocaine trafficking involving Daemion TAYLOR, and Charles CAWELLE among others. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) Title III wire intercepts of a telephone utilized by TAYLOR; and Title III wire/electronic intercepts of a telephone utilized by CAWELLE; (b) and reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers.

4. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with cooperating witnesses, and informants, whose reliability is established separately herein.

5. The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants, information from other law enforcement officers; recorded conversations; controlled buys; Title III wire intercepts; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures. However, because this affidavit is submitted for the limited purpose of securing

4

authorization for search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested criminal complaint.

## II.     PURPOSE OF AFFIDAVIT

6.     This affidavit is submitted in support of application for a criminal complaint for Daemion Taylor, for conspiracy to distribute cocaine and the possession with intent to distribute in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), and 846.

## III.    PROBABLE CAUSE

7.     In November 2015, St. Louis Metropolitan Police-Intelligence Division (SLMPD) received information from a Confidential Source (CS#1) regarding individuals, later identified as being Lawrence MARONEY and Maurice BANKS, who were distributing large quantities of heroin, cocaine, and marijuana throughout the Metropolitan St. Louis area. Members of the DEA St. Louis Division, along with members of the SLMPD Intelligence Division, initiated an investigation into the heroin, cocaine and marijuana trafficking activities of MARONEY and BANKS. During the initial months of the investigation, CS#1 provided pro-active intelligence on the methods, means, and organization of the Drug Trafficking Organization (DTO). In June 2016, CS#1 informed investigators that he/she was no longer in contact with any members of the DTO. As a result, this investigation was temporarily inactive. In September 2016, DEA St. Louis investigators established another Confidential Source (CS#2). CS#2 was able to provide investigators with intelligence on the DTO, and was also able to conduct controlled purchases of narcotics from BANKS. DEA St. Louis investigators were able to obtain court-authorization to intercept a telephone utilized by BANKS. While monitoring the telephone, DEA St. Louis investigators identified Juan CHASE as a St. Louis-based source of supply to both MARONEY

5

and BANKS. On June 12, 2017, DEA St. Louis investigators received authorization for interception/monitoring on a telephone utilized by CHASE. During interception, CHASE's cocaine source of supply was identified as Daemion TAYLOR. On July 20, 2017, DEA St. Louis investigators obtained court-authorization to intercept, and monitor the telephone utilized by TAYLOR. During interception, TAYLOR's cocaine source of supply was identified as Charles CAWELLE.

### Surveillance on June 21, 2017

8. On June 21, 2017, DEA Milwaukee District Office investigators received information from DEA St. Louis, regarding the location of TAYLOR's telephone. The telephone was showing to be in the area of W. North Ave. and N. Hubbard Street in Milwaukee, WI. Investigators conducted a spot-check of the area and observed a grey Ford Taurus with Missouri license plates parked in front of 2222 N. Hubbard. Additionally, the phone was showing to be in close proximity to 2221 N. Hubbard Street. Investigators utilized law enforcement databases, which showed 2221 N. Hubbard Street to be associated with a Daemion TAYLOR. More specifically, TAYLOR is listed as the registered agent for Tayla Boy Enterprise LLC, which lists 2221 N. Hubbard Street as the business address.

9. In late June 2017, investigators monitored the precision location information (PLI) on TAYLOR's telephone, as it traveled to St. Louis, Missouri. DEA St. Louis investigators later observed the same Ford Taurus (mentioned above), driven by a heavy-set black male subject (believed to be TAYLOR) arrive to conduct a drug/money transaction with CHASE.

10. During a further inquiry into TAYLOR's criminal history, investigators located a Milwaukee Police Department incident report involving TAYLOR from February 15, 2010. During the investigation, detectives identified TAYLOR as a large-scale marijuana distributor.

Detectives learned that TAYLOR drove a vehicle registered to a Letonna Bradford, and located the vehicle parked in front of 2221 N. Hubbard Street. Detectives observed TAYLOR exit 2221 N. Hubbard Street, carrying a large bag. Following a traffic stop, and arrest of TAYLOR, investigators discovered the bag contained bulk marijuana. Investigators learned that TAYLOR lived at 2221 N. Hubbard Street #1 with his girlfriend, Letonna Bradford. In August 2017, DEA Milwaukee investigators obtained utilities information for 2221 N. Hubbard Street, listing Letonna Bradford as the current utilities holder.

### Surveillance on July 14, 2017

11.     On July 14, 2017, investigators monitored the PLI on TAYLOR's telephone, which showed he was returning from St. Louis, Missouri. Investigators established surveillance of 2221 N. Hubbard Street, in the event TAYLOR returned to same. At approximately 2:20 p.m., investigators set up in the immediate area. Minutes later, investigators observed a grey Dodge Charger arrive in front of 2221 N. Hubbard Street. A female subject exited, and walked towards 2221 N. Hubbard Street, and out of investigators' view. 2221 N. Hubbard Street is situated to the rear of other residences on N. Hubbard Street, making it difficult to observe the front entrance, without compromising surveillance.

12.     At approximately 2:44 p.m., the same black female subject returned to the grey Charger, carrying a black duffle bag. The female subject placed the black duffle bag into the rear seat of the vehicle. Investigators observed the female subject return to the vehicle two more times, each time carrying the same style black duffle bag, placing same into the grey Charger. At approximately 3:07 p.m., investigators observed a newer silver Dodge Charger arrive at 2221 N. Hubbard Street. The driver exited, and was identified by surveillance as TAYLOR. TAYLOR

7

walked towards 2221 N. Hubbard Street, and out of investigators' view. Minutes later, the female subject entered the grey Charger and departed the area.

13. Approximately 2 minutes afterward, TAYLOR walked away from the front yard of 2221 N. Hubbard Street, and re-entered the silver Charger, departing the area. Investigators believe TAYLOR responded to 2221 N. Hubbard Street, following his return from St. Louis, MO., in order to oversee the transfer of drugs/money from 2221 N. Hubbard Street. This belief is supported by investigators' observations of the female subject carrying large duffle bags from area of 2221 N. Hubbard Street, and later departing with same.

14. On July 20, 2017, DEA St. Louis investigators obtained authorization to intercept, and monitor the telephone utilized by TAYLOR. On July 21, 2017, investigators monitored a series of calls between TAYLOR and a male subject, later identified as Charles CAWELLE.

**15. July 21, 2017 – 11:09 a.m. (Call session 39) – Incoming call**

CAWELLE: Yo, where you at?

TAYLOR: Collecting, collecting, collecting.

CAWELLE: You know what my deadline is looking like so I need for you to get on the road or figure something out so I can be on my way.

TAYLOR: I already know your deadline I'm trying to bring you all three. I'm still going through the last five grand ($5,000) on my…I'm bringing the paperwork for three and then you need the one… Because, I've got to go to the house and grab the rest.

16. Investigators believe based on training, experience, and the instant investigation to date, TAYLOR and CAWELLE are discussing the collection of money in order to obtain a quantity of cocaine. When TAYLOR states he is "bringing the paperwork for three," investigators believe he is referring to money for 3 kilograms of cocaine. Investigators also

believe that when TAYLOR states he had to go to "the house and grab the rest," TAYLOR was referring to picking up more money from 2221 N. Hubbard Street.

### 17. July 21, 2017 – 12:02 p.m. (Call session 47) – Outgoing call

They greet, and argue about getting money together. Later in the conversation:

TAYLOR: I have sixty something..Listen If I get fucked up on the road with police..Im going to be responsible for this...I have sixty on me now..and trying to go to the house to go get the other one because Im coming...

They continue arguing about getting money together. Later in the conversation:

CAWELLE: Listen man I understand im just telling you because they want me to leave out and I can't go no where until you get here.

18. Investigators believe TAYLOR was informing CAWELLE that he (TAYLOR) had approximately $60,000 so far, and was planning to go to "the house to go get the other one" (additional money). Investigators further believe CAWELLE was getting impatient with TAYLOR, since CAWELLE had individuals (drug traffickers) waiting on him to come up with the money.

### Surveillance on July 21, 2017

19. During the above intercepted calls, DEA Milwaukee investigators established surveillance on 2221 N. Hubbard Street. At approximately 3:34 p.m., investigators observed a dark grey Chevrolet Tahoe bearing Wisconsin license plate 468-ZFB with dark tinted windows, pull onto N. Hubbard Street. The vehicle pulled up directly next to a DEA surveillance vehicle, blocking the roadway, before continuing southbound. Investigators relocated the Tahoe as it parked at the NY Pizza business parking lot; located at 231 E. North Ave.; Milwaukee, WI. According to records from the Wisconsin Department of Transportation, Wisconsin license plate

468-ZFB is listed to Daemion TAYLOR; 333 W. Brown Deer Rd. #242; Bayside, WI.; on a red 2007 Chevrolet Tahoe.

20. Investigators were unable to see if anyone exited/entered the Tahoe at this time. At approximately 4:03 p.m., investigators observed TAYLOR walking in the front yard of 2221 N. Hubbard Street, and then northbound on the sidewalk of N. Hubbard. TAYLOR was carrying a black bag in his hand, as he re-entered the Tahoe. Investigators believe TAYLOR arrived at 2221 N. Hubbard Street in order to pick up the remaining money meant for a future drug/money transaction.

21. Investigators followed TAYLOR as he departed in the Tahoe, later merging onto southbound Hwy 43. Due to high traffic volume, investigators were unable to maintain physical surveillance on the Tahoe, and surveillance was terminated.

### Surveillance on July 26, 2017

22. On July 26, 2017, at approximately 8:50 a.m., DEA Milwaukee investigators established surveillance of 2221 N. Hubbard Street. This was in response to previously intercepted telephone calls monitored by DEA St. Louis. During the calls, TAYLOR and CAWELLE discuss TAYLOR bringing a quantity of money to CAWELLE in order for CAWELLE to obtain a quantity of narcotics from CAWELLE's SOS.

23. At approximately 10:11 a.m., investigators observed TAYLOR exit the front door to 2221 N. Hubbard Street. TAYLOR was carrying a large trash bag, and was wearing a black backpack. TAYLOR tossed the trash bag into a trash bin before walking southeast towards his previously identified dark gray Chevrolet Tahoe, which was parked one block over from 2221 N. Hubbard Street. Investigators believe TAYLOR intentionally parked his vehicle away from 2221 N. Hubbard Street, in order to conceal its' location from law enforcement.

10

24. DEA St. Louis investigators monitored another telephone call between TAYLOR and CAWELLE, where TAYLOR advised he was planning to pick up the rest of the money from another Milwaukee-based associate, before bringing it to CAWELLE. TAYLOR advised CAWELLE that this may occur the following day (July 27, 2017).

25. On August 10, 2017, The Honorable William E. Duffin, U.S. Magistrate Judge, Eastern District of Wisconsin, authorized the installation of the GPS tracking device on Daemion TAYLOR's Chevrolet Tahoe. On August 14, 2017, investigators executed the federal GPS tracking device search warrant on the vehicle.

26. On August 29, 2017, DEA Milwaukee investigators conducted maintenance on the GPS tracking device currently attached to Daemion TAYLOR's Chevrolet Tahoe. At approximately 3:50 a.m., the Tahoe was traveling towards 2221 N. Hubbard Street. At approximately 3:55 a.m., the Tahoe was showing to be directly in front of 2221 N. Hubbard Street. Investigators arrived in the area, and at approximately 4:04 p.m., investigators observed TAYLOR's Tahoe traveling west on W. North Avenue from N. Hubbard Street. At approximately 4:06 a.m. the Tahoe was showing to be on N. Palmer Street south of E. Garfield Avenue.

27. On August 29, 2017, investigators established surveillance in the area of E. Garfield and N. Hubbard. At approximately 4:08 a.m., investigators observed a heavy-set male subject, wearing a grey hoodie sweatshirt and dark pants, walking east on E. Garfield Avenue, before walking north on N. Hubbard Street. As the subject walked under a street light, investigators positively identified him as TAYLOR. Investigators maintained visual on TAYLOR as he walked towards the front yard of 2221 N. Hubbard Street. Due to the location of 2221 N. Hubbard Street; in the rear yard of neighboring residences, investigators were unable to see if

11

TAYLOR entered the same. At approximately 4:20 a.m., investigators completed the maintenance on the GPS tracking device, and surveillance was terminated.

28. Investigators believe TAYLOR briefly parked directly in front of 2221 N. Hubbard Street, in order to safely transfer an unknown item from his vehicle into 2221 N. Hubbard Street, before relocating the vehicle approximately one block away. Investigators further believe TAYLOR's behavior of habitually parking his vehicle away from 2221 N. Hubbard Street, indicates TAYLOR's desire to keep his location hidden, with respect to 2221 N. Hubbard Street.

29. In late October 2017, investigators conducted surveillance of the 2221 N. Hubbard Street and observed a white Chevrolet van bearing Wisconsin plates NN7196 parked on the front lawn of the residence. The plates are registered to Runner Enterprise, LLC. Law enforcement databases showed that TAYLOR is listed as the President of Runner Enterprise, LLC, 2221 N. Hubbard Street is the listed address.

30. In late October, law enforcement determined that TAYLOR was using telephone number 954-470-6715. On November 1, 2017, the Honorable Nancy Joseph authorized a warrant for prospective location information for this telephone number.

31. On November 1, 2017, investigators were monitoring the GPS location information for this telephone number and at approximately 9:32 p.m. the phone was in close proximity or within 2221 N. Hubbard Street.

32. At approximately 1:00 a.m. on November 2, 2017, the telephone was traveling southbound.

33. At approximately 4:02 a.m., on November 2, 2017, the TAYLOR'S cell phone was in the area of Interstate 90 near O'Hare International Airport, in Illinois. At approximately 4:17

12

a.m., the telephone was near the Holiday Inn Express located at 5615 N. Cumberland Avenue, in Chicago, Illinois. This same Holiday Inn Express was previously utilized by CAWELLE during a marijuana transaction on September 28, 2017, as observed during law enforcement surveillance. At approximately 10:00 a.m., investigators established surveillance at the Holiday Inn Express Hotel. Investigators observed TAYLOR and unidentified male approach the previously identified white Chevrolet van carrying several pieces of luggage. They entered the vehicle and departed. Later, while traveling south on Interstate 57 south of Chicago, investigators coordinated with the Illinois State Police to conduct a traffic stop of van. Law enforcement conducted the traffic stop and searched the van. Bulk U.S. currency was located in van.

34. On November 9, 2017, case agents executed the search warrant at 2221 North Hubbard Street. Taylor was the only person present in the residence at the time of the search. Upon entry into the residence, case agents located Taylor in the basement near the stairs. Upon conducting a search of the basement, case agents located a backpack inside the dryer in the basement. Inside the backpack was 8 kilogram-sized packages of a white powdery substance suspected to be cocaine. The white powdery substance later tested positive for the presence of cocaine.

35. During the search, case agents also located 9 firearms, including 7 handguns and two assault-style rifles. Seven of the firearms were secreted within a hidden compartment inside the basement stairs. After being advised of and waiving his rights, Taylor admitted to possessing the kilograms of cocaine.

36. Based on records from Immigration and Customs Enforcement, case agents are aware that Taylor has a final immigration order of removal to the Country of Jamaica through the United States Immigration Courts.

## IV. CONCLUSION

37. Based upon the facts set forth above, I allege the facts contained in this affidavit show that there is probable cause to believe that on between September and November 2017, in the State and Eastern District of Wisconsin, and elsewhere, Daemion Taylor and others known and unknown, have committed, and will continue to commit federal felony offenses including, but not limited to conspiracy to possess with intent to distribute cocaine and possession with intent to distribute of cocaine, all in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), and 846.